CHEYENNE INGRAM,

        Petitioner,

                            Case No. 16-cv-11045

v.

                            HON. MARK A. GOLDSMITH

THOMAS MACKIE,

        Respondent.

_____/

## OPINION AND ORDER
## DENYING PETITION FOR WRIT OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner Cheyenne Ingram, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. 1), challenging his convictions for one count of conspiracy to commit first-degree murder, Mich. Comp. Laws §§ 750.157a, 750.316; and six counts of assault with intent to commit murder, Mich. Comp. Laws § 750.83. For the reasons stated below, the Court denies petition for writ of habeas corpus, declines to issue a certificate of appealability, but grants Petitioner leave to proceed in forma pauperis on appeal.

## I. BACKGROUND

Petitioner was convicted following a jury trial in the Oakland County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009).

> Defendant's convictions arise from a shooting at a private skating
> party at the Rolladium skating rink in Waterford Township during

the early morning hours of December 23, 2011. According to advertising fliers, the party was sponsored by "$GME$ & LBM.[1]" The party began on the evening of December 22, 2011, and continued into the early morning hours of December 23. During the event, a number of fights broke out.

According to Quintin Hardiman, a security officer at the Rolladium, defendant, Treandis Jamison,[2] and Robert German were ejected from the building after an initial large fight. Hardiman had hoped that the ejection would end the fighting. After defendant was ejected, Hardiman observed him standing outside the building holding a small-barreled revolver. Defendant was breathing hard and Hardiman heard him say, "They jumped on me." Hardiman left his station at the entranceway to break up more fighting inside. The entrance doors were locked to prevent entry from the outside, but a person could still gain entry if someone from the inside opened the door. Shortly after Hardiman left his position at the entranceway, gunshots were fired inside the building. The prosecutor argued at trial that defendant, Treandis Jamison, and Robert German all entered the building and fired guns indiscriminately into a large crowd of party attendees. The defense theory at trial was that defendant was not involved in the shooting.

Surveillance cameras captured some of the activities inside and outside the building, including images of defendant with Jamison and German in the parking lot and their movements after they

---

[1] In its opinion, this footnote originally appeared in the sentence as footnote 2, in which the Michigan Court of Appeals wrote, "Oakland County Sheriff's Deputy Greg Moore testified that 'LBM' stood for 'Leak Boy Mafia,' which is allegedly a family organization associated with Pontiac and other 'street organizations' that his unit has investigated since his assignment to the FBI violent gang task force in 2008." People v. Ingram, No. 312656, 2014 WL 1679128, at *1 n.2.

[2] In its opinion, this footnote originally appeared in the sentence as footnote 3, in which the Michigan Court of Appeals wrote, "Defendant was tried jointly with codefendant Jamison, before a separate jury. Jamison was convicted of six counts of assault with intent to commit murder, conspiracy to commit first-degree murder, carrying a concealed weapon, MCL 750.227, and six counts of possession of a firearm during a commission of a felony, MCL 750.227b. Codefendant Jamison's appeal is pending in Docket No. 312460, which has been submitted with this appeal for this Court's consideration." Ingram, 2014 WL 1679128, at *1 n.3.

reentered the building and proceeded to the archway entrance of the skating rink where the gunshots were fired. Six persons received gunshot injuries.

People v. Ingram, No. 312656, 2014 WL 1679128, at *1 (Mich. Ct. App. Apr. 24, 2014) (per curiam).

Petitioner's conviction was affirmed on appeal. Id. at *10, leave denied, 853 N.W.2d 363 (Mich. 2014).

Petitioner seeks a writ of habeas corpus on the following four grounds:

i.   "The great weight of the evidence presented by the prosecutor was insufficient to establish beyond a reasonable doubt that the defendant was guilty of the crimes for which he was charged and convicted, pursuant to US Const, Ams V, VI, XIV; Const 1963, Art 1, Sec 17, 20."

ii.  "The prosecutor's misconduct deprived Mr. Ingram of a fair trial and due process of law, the error was plain, or in the alternative trial counsel was ineffective for not objecting."

iii. "The prosecutor's failure to list key witness Quintin Hardiman in the name of potential witnesses during voir dire of the jury denied Mr. Ingram his right to an impartial jury under US Const Am VI; Const 1963, Art 1, Sec 20, or in the alternative, trial counsel was ineffective for not objecting."

iv.  "The trial court incorrectly denied defense counsel's motion to suppress Quintin Hardiman's pretrial identification of the defendant where the totality of circumstances establish that the pre-trial identification was impermissibly suggestive, in violation of the defendant's due process rights."

Pet. at ii.

## II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011).

The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102. Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA. See Wetzel v. Lambert, 132 S. Ct. 1195, 1199 (2012).

"If this standard is difficult to meet, that is because it was meant to be." Harrington, 562 U.S. at 102. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. Id. Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." Woodford v. Viscotti, 537 U.S. 19, 24 (2002). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-787.

A state court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only

with clear and convincing evidence.  Id.; Warren v. Smith, 161 F.3d 358, 360-361 (6th Cir. 1998).  Moreover, habeas review is "limited to the record that was before the state court." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

## III.  ANALYSIS

### A.  Claim One:  The Sufficiency-of-Evidence Claim

Petitioner argues that the evidence was insufficient to convict him of either conspiracy to commit first-degree murder or assault with intent to commit murder.  Petitioner argues that, at most, the evidence established his mere presence at the skating rink, but it did not show that he conspired with or aided and abetted the other shooters.  Petitioner also challenges the credibility of the main witness, Quintin Hardiman.

The Michigan Court of Appeals rejected Petitioner's claim:

> Viewed in a light most favorable to the prosecution, the evidence was sufficient to establish each conviction offense.  Hardiman's testimony, if believed by the trier of fact, was sufficient to identify defendant as one of the persons ejected from the building after the initial fight.  Although there was no photographic evidence showing that defendant was involved in the fight, one of the assault victims, Cargle, testified that he saw defendant "running off at the mouth."  According to Waterford Township Police Detective Jack Sutherford, surveillance photographs depicted Cargle fighting with a person believed to be German.  In light of Hardiman's testimony that he used a metal detector to search individuals entering the building for weapons before this fight, a jury could reasonably infer that defendant, German, and Jamison did not have a gun at the time of this initial fight.
>
> The surveillance photographs support an inference that defendant was acting in concert with German and Jamison before and after the initial fight began, and that they each acquired a gun at some point while outside the building.  Hardiman's testimony indicated that defendant tried to gain reentry while holding a small-barreled revolver, and that Hardiman thereafter left the building entrance to

deal with more fighting inside. Although the entrance door was locked from the outside, someone on the inside would have been able to open the door to allow an outside person to enter the building. Surveillance photographs depicted German, followed by Jamison and defendant, back inside the building after Hardiman left his post at the door. The placement of defendant's hands in the photographs suggested that he could have been concealing a gun, like his companions, as they walked toward the entranceway or archway to the skating rink. A firearms examiner testified that evidence recovered following the shooting indicated that between two and four weapons were involved. This evidence, combined with the evidence that defendant was observed possessing a revolver outside the building, supports an inference that defendant was armed with a gun while approaching the entranceway to the skating rink.

We disagree with defendant's argument that the surveillance photograph depicting him running toward the exit after the gunfire started precluded the jury from finding that he actively participated in the offense while out of sight from the surveillance cameras. Even if defendant did not directly participate in the shooting, the evidence that he was armed with a firearm and acted in concert with German and Jamison would have allowed the jury to find that he aided and abetted his companions by adding security and support. Similarly, defendant's act of running after the shooting did not preclude the jury from finding beyond a reasonable doubt that defendant had agreed with Jamison and German before reentering the building to take the lethal action of shooting into the area of the skating rink. Further, evidence was presented that defendant gave the police a false name after the shooting on January 17, 2012. Evidence that a defendant tried to flee or conceal his identity from the police is relevant to show consciousness of guilt. Considered as a whole, and viewed in the light most favorable to the prosecution, the evidence was sufficient to establish defendant's guilt of both a conspiracy to commit first-degree murder and the six counts of assault with intent to commit murder beyond a reasonable doubt.

Ingram, 2014 WL 1679128, at * 5-6.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 318-319 (emphasis in the original).

Furthermore, a federal habeas court may not overturn a state-court decision that rejects a sufficiency-of-the-evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state-court decision was an objectively unreasonable application of the Jackson standard. See Cavazos v. Smith, 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Id. Indeed, for a federal habeas court reviewing a state-court conviction, "the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality." Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012).

Under Michigan law, a conspiracy is defined as "'a mutual agreement or understanding, express or implied, between two or more persons to a commit a criminal act.'" Cameron v. Birkett, 348 F. Supp. 2d 825, 839 (E.D. Mich. 2004) (quoting People v. Carter, 330 N.W.2d 314,

319 (Mich. 1982)). "[A] two-fold specific intent is required for conviction: intent to combine with others, and intent to accomplish the illegal objective." Carter, 330 N.W.2d at 319. Direct proof of an agreement is not required, nor is proof of a formal agreement necessary. Rather, "[i]t is sufficient that the circumstances, acts, and conduct of the parties establish an agreement. People v. Cotton, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991). A conspiracy may be proven by circumstantial evidence or may be based on inference. Id. at 688-689.

"Under Michigan law, anyone who knowingly agrees with someone else to commit first degree premeditated murder is guilty of conspiracy to commit first degree premeditated murder." Bechtol v. Prelesnik, 568 F. App'x. 441, 449 (6th Cir. 2014). To prove conspiracy to commit murder under Michigan law, "it must be demonstrated that each conspirator had the requisite intent to commit the murder." Cameron, 348 F. Supp. 2d at 839 (quoting People v. Buck, 496 N.W.2d 321, 327 (Mich. Ct. App. 1992), rev'd in part on other grounds sub nom., People v. Holcomb, 508 N.W.2d 502 (Mich. 1993)). "The prosecution must demonstrate that the conspirators deliberated and planned the crime with the intent to kill the victim." Id.

To obtain a conviction for first-degree murder, the prosecutor must prove that a defendant's intentional killing of another was deliberated and premeditated. See Scott v. Elo, 302 F.3d 598, 602 (6th Cir. 2002) (citing People v. Schollaert, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992)). The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. See Johnson v. Hofbauer, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001) (citing People v. Anderson, 531 N.W.2d 780 (Mich. Ct. App. 1995)).

Premeditation may be established through evidence of the following factors: (i) the prior relationship of the parties; (ii) the defendant's actions before the killing; (iii) the circumstances

of the killing itself; and (iv) the defendant's conduct after the homicide. Cyars v. Hofbauer, 383 F. 3d 485, 491 (6th Cir. 2004).

Under Michigan law, the elements of assault with intent to commit murder are: (i) an assault; (ii) with an actual intent to kill; (iii) which, if successful, would make the killing murder. See Warren v. Smith, 161 F.3d 358, 361 (6th Cir. 1998); see also Steele v. Withrow, 157 F. Supp. 2d 734, 740 (E.D. Mich. 2001). The intent-to-kill element does not equate with murder. Warren, 161 F.3d at 361 (citing People v. Taylor, 375 N.W.2d 1, 7 (Mich. 1985)). Thus, a defendant's intent to kill for purposes of this offense may not be proven by an intent to inflict great bodily harm, or a wanton and willful disregard of the likelihood that the natural tendency of the acts will likely cause death or great bodily harm. Id. Therefore, a conviction for assault with intent to commit murder must be premised upon a defendant's specific intent to kill. Steele, 157 F. Supp. 2d at 740 (citing People v. Edwards, 431 N.W.2d 83 (Mich. Ct. App. 1988)).

The intent to kill, for purposes of the crime of assault with intent to commit murder, need not be proved by direct, positive, or independent evidence, and the trier of fact may draw reasonable inferences from the facts and evidence in determining the existence of an intent to kill. See Taylor, 375 N.W.2d at 7-8. In determining the defendant's intent, a court may take into account "[t]he nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made." Id. at 8. The use of a lethal weapon will support an inference of an intent to kill. Steele, 157 F. Supp. 2d at 740.

To support a finding that a defendant aided and abetted in the commission of a crime under Michigan law, the prosecutor must show that: (i) the crime charged was committed by the defendant or some other person; (ii) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (iii) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. Riley v. Berghuis, 481 F.3d 315, 322 (6th Cir. 2007) (citing People v. Carines, 597 N.W.2d 130 (Mich. 1999)).

In order to convict a defendant of assault with intent to commit murder under an aiding and abetting theory, the prosecution is required to prove either that defendant specifically intended to kill the victim or victims, or that he or she was aware that his or her co-defendant specifically intended to kill the victim or victims. See, e.g., Warren, 161 F.3d at 361-362.

In order to be guilty of aiding and abetting under Michigan law, the accused must take some conscious action designed to make the criminal venture succeed. See Fuller v. Anderson, 662 F.2d 420, 424 (6th Cir. 1981). Aiding and abetting describes all forms of assistance rendered to the perpetrator of the crime, and comprehends all words or deeds that might support, encourage, or incite the commission of the crime. People v. Turner, 540 N.W.2d 728, 733 (Mich. Ct. App. 1995). The quantum or amount of aid, advice, encouragement, or counsel rendered, or the time of rendering, is not material if it had the effect of inducing the commission of the crime. People v. Lawton, 492 N.W.2d 810, 816 (Mich. Ct. App. 1992). Finally, the Michigan Supreme Court has held that there is no language in Michigan's aiding and abetting statute that shows an intent by the Michigan Legislature "to abrogate the common-law theory that a defendant can be held criminally liable as an accomplice if: (1) the defendant intends or is aware that the principal is going to commit a specific criminal act; or (2) the criminal act committed by the principal is an

incidental consequence which might reasonably be expected to result from the intended wrong." People v. Robinson, 715 N.W.2d 44, 49 (Mich. 2006).

To be convicted of aiding and abetting, the defendant must either possess the required intent to commit the crime or have participated while knowing that the principal had the requisite intent; such intent may be inferred from circumstantial evidence. See Long v. Stovall, 450 F. Supp. 2d 746, 753 (E.D. Mich. 2006); People v. Wilson, 493 N. W. 2d 471 (Mich. Ct. App. 1992). The intent of an aider and abettor is satisfied by proof that he knew the principal's intent when he gave aid or assistance to the principal. People v. McCray, 533 N.W.2d 359, 361 (Mich. Ct. App. 1995). An aider and abettor's state of mind may be inferred from all of the facts and circumstances, including close association between the defendant and the principal, the defendant's participation in the planning and execution of the crime, and evidence of flight after the crime. Turner, 540 N.W.2d at 734.

Mere presence, even with knowledge that a crime is being committed, is insufficient to establish that a defendant aided and abetted in the commission of the offense. People v. Norris, 600 N.W.2d 658, 663 (Mich. Ct. App. 1999); see also Anderson, 662 F.2d at 424. "[H]owever, a claim of mere presence is not a 'catch-all excuse' to defeat an inference of guilt beyond a reasonable doubt. In evaluating a 'mere presence' defense, a factfinder must distinguish, based upon the totality of the circumstances, between one who is merely present at the scene and one who is present with criminal culpability." Stovall, 450 F. Supp. at 754. An aider and abettor who is intentionally present during the commission of a crime may be silent during the crime's commission, "but by his demeanor, or through behavior and acts not directly related to the crime, provide 'moral support' that is recognizable to, and relied upon by, the principal. Such acts may be silent and may not be overt but may still amount to more than 'mere' presence." Sanford v.

Yukins, 288 F.3d 855, 862 (6th Cir. 2002).  Michigan's "broad definition" of aiding and abetting "easily encompasses situations where the alleged aider and abettor, although silent and not committing acts directly related to the crime, was not 'merely' present, but providing emotional encouragement and support."  Id.

The Michigan Court of Appeals reasonably determined that a rational trier of fact could reject Petitioner's mere presence argument and find him guilty of conspiring with his co-defendants to murder persons inside of the skating rink, and that he either himself shot at several persons in the skating rink or aided and abetted the co-defendants with their assault on the patrons of the rink.

Petitioner was ejected from the rink after an initial fight.  One of the assault victims, a Mr. Cargle, testified that Petitioner had been "running off at the mouth" during the fight, which would suggest Petitioner's involvement.  Surveillance photographs suggested that Cargle had been fighting with co-defendant German.  The jury could reasonably infer that neither Petitioner nor his co-defendants had weapons on them during this initial confrontation, because Hardiman had used a metal detector to search the patrons for weapons before they entered the rink.

The surveillance photographs showed that Petitioner was with co-defendants German and Jamison before and after the initial fight.  Hardiman testified that Petitioner returned to the rink and attempted to gain entry while brandishing a small-barreled revolver.  Petitioner was also angry about having been "jumped" earlier inside the rink, which would have established a motive for his involvement in the shooting.

Although Hardiman informed Petitioner that he could not re-enter the building while armed with a weapon, Hardiman left his post to respond to more fighting inside, which enabled Petitioner and the co-defendants to get inside while armed with weapons.  Surveillance

photographs showed Petitioner and the two co-defendants back inside of the skating rink after Hardiman left his post. Petitioner was also seen on the surveillance video with his hands in his pocket, which suggested that he was concealing the firearm that Hardiman had seen him with at the door. The video suggested that Petitioner's two co-defendants were also concealing weapons.

A firearms expert indicated that the evidence at the crime scene suggested that between two and four weapons were involved. Six persons were shot. Although Petitioner was later seen running towards the exit after the shooting started, this could be just as consistent with Petitioner attempting to escape the crime scene after he himself had fired some shots as his argument that he was not involved in the shooting. Finally, Petitioner gave the police a false name after the shooting.

Petitioner's active involvement throughout the entire episode from the initial fight between Cargle and German through to the shooting could lead a rational trier of fact to conclude that Petitioner agreed with the other two defendants to kill persons inside of the skating rink, so as to support his conviction for conspiracy to commit murder. Cameron, 348 F. Supp. 2d at 840. Moreover, Petitioner's act of giving a false named to the police established a "continuing attempt to hide the conspiracy." This evidence of Petitioner's consciousness of guilt also supported an inference that Petitioner conspired with the others to kill the victims. Id. Petitioner is not entitled to habeas relief because the Michigan Court of Appeals reasonably concluded that, from the evidence, a rational trier of fact could have found the essential elements of conspiracy to commit first degree murder beyond a reasonable doubt. Bechtol, 568 F. App'x at 449.

Likewise, in light of the evidence presented in this case, the Michigan Court of Appeals did not unreasonably apply clearly established federal law in determining that the evidence was

sufficient to convict Petitioner of assault with intent to commit murder on an aiding and abetting theory. See Brown v. Konteh, 567 F.3d 191, 209-212 (6th Cir. 2009). In particular, "in light of the strong circumstantial evidence" that Petitioner "was involved in the planning and execution of" these crimes, "at least one 'rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" Davis v. Lafler, 658 F.3d 525, 535 (6th Cir. 2011) (quoting Jackson, 443 U.S. at 319). Moreover, when Petitioner's case is reviewed pursuant to the AEDPA's "double deference" standard, this Court is unable to state that the Michigan Court of Appeals' decision that there was sufficient evidence to convict Petitioner under an aiding and abetting theory was "so far out of line with the very general standard set forth in Jackson v. Virginia as to warrant granting [Petitioner] habeas relief." Id.

To the extent that Petitioner challenges Hardiman's credibility, he would not be entitled to habeas relief. Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence. See Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir. 2002). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. See Gall v. Parker, 231 F.3d 265, 286 (6th Cir. 2000). To the extent that Petitioner challenges the credibility of the witnesses, he would not entitled to habeas relief. See Tyler v. Mitchell, 416 F. 3d 500, 505 (6th Cir. 2005). Therefore, Petitioner is not entitled to habeas relief on his first claim.

**B. Claim Two: The Prosecutorial-Misconduct/Ineffective-Assistance-of-Counsel Claim**

Petitioner next claims that he was denied a fair trial by prosecutorial misconduct and trial counsel's failure to object to the misconduct.

The Court recognizes that the Michigan Court of Appeals reviewed and rejected Petitioner's second claim under a plain-error review, because Petitioner failed to preserve the issues as a constitutional claim at the trial court level.[3]

In Fleming v. Metrish, a panel of the Sixth Circuit held that the AEDPA deference applies to any underlying plain-error analysis of a procedurally defaulted claim. 556 F.3d 520, 532 (6th Cir. 2009). In a subsequent decision, the Sixth Circuit held that that plain-error review is not equivalent to adjudication on the merits, so as to trigger AEDPA deference. See Frazier v. Jenkins, 770 F.3d 485, 496 n.5 (6th Cir. 2014). The Sixth Circuit has noted that "the approaches of Fleming and Frazier are in direct conflict." Trimble v. Bobby, 804 F.3d 767, 777 (6th Cir. 2015). When confronted by conflicting holdings of the Sixth Circuit, this Court must follow the earlier panel's holding until it is overruled by the United States Supreme Court or by the Sixth Circuit sitting en banc. See Darrah v. City of Oak Park, 255 F.3d 301, 310 (6th Cir. 2001). This Court believes that the AEDPA's deferential standard of review applies to the prosecutorial misconduct claims, even though they were reviewed only for plain error.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004) (citing Bowling v. Parker, 344 F. 3d 487, 512 (6th Cir. 2003)). A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986)

---

[3] Respondent urges this Court to deny these claims on the ground that they are procedurally defaulted because Petitioner failed to object at trial. Petitioner argues that counsel was ineffective for failing to object. Ineffective assistance of counsel may establish cause for procedural default. Edwards v. Carpenter, 529 U.S. 446, 451-452 (2000). Given that the cause and prejudice inquiry for the procedural-default issue merges with an analysis of the merits of Petitioner's defaulted claims, it would be easier for this Court to consider the merits of these claims. See Cameron v. Birkett, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

(quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)). Thus, prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. <u>Donnelly</u>, 416 U.S. at 643-645. In order to obtain habeas relief on a prosecutorial-misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial-misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2155 (2012) (quoting <u>Harrington</u>, 562 U.S. at 103).

Petitioner first contends that the prosecutor committed misconduct by introducing evidence through Deputy Moore to suggest that the shooting was gang-related and that Petitioner was somehow involved in a gang. The Michigan Court of Appeals rejected the claim:

> We find no merit to defendant's argument that the prosecutor's offer of proof in relation to Deputy Moore's testimony was improper. A prosecutor's good-faith effort to admit testimony does not constitute misconduct so long as the attempt does not prejudice the defendant. In this case, the prosecutor's offer of proof regarding whether Deputy Moore should be permitted to offer testimony concerning gang activity was made outside the presence of the jury. Because the admissibility of this testimony was addressed outside the presence of the jury, and the prosecutor stayed within the parameters of the trial court's evidentiary ruling when eliciting testimony regarding the meaning of LBM, defendant has not established any misconduct by the prosecutor.

> To the extent that defendant challenges the trial court's evidentiary ruling to allow Deputy Moore to offer testimony regarding the meaning of the initials LBM, we review the trial court's decision for an abuse of discretion. The trial court allowed the testimony because this subject matter was raised during the prior testimony of Lee Grayer, the promoter for the skating party. The testimony was limited to the meaning of the initials "LBM." Contrary to what defendant argues, the trial court did not allow the evidence to establish that defendant was part of the gang, expressly or by innuendo. The trial court also offered to provide a cautionary instruction, upon request, to avoid any perceived prejudice arising

from the limited testimony. Under these circumstances, the trial court did not abuse its discretion.

*Ingram*, 2014 WL 1679128, at *6.

Although Petitioner has framed his claim as a prosecutorial-misconduct challenge, "it amounts in the end to a challenge to the trial court's decision to allow the introduction of this evidence." Webb v. Mitchell, 586 F.3d 383, 397 (6th Cir. 2009). "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." Cristini v. McKee, 526 F.3d 888, 900 (6th Cir. 2008). Furthermore, it is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). The trial court ruled that testimony concerning the meaning of the term "LBM" was relevant and admissible because the promotor of the skating party had brought the issue up when he had testified. A prosecutor does not commit misconduct by introducing relevant evidence. See Slagle v. Bagley, 457 F.3d 501, 516 (6th Cir. 2006). Moreover, even if the prosecutor's questions to Deputy Moore could have been construed as an attempt to introduce evidence that Petitioner was in a gang, Petitioner would not be entitled to habeas relief because these questions were isolated. See Toler v. McGinnis, 23 F. App'x 259, 269-270 (6th Cir. 2001).

Petitioner next contends that the prosecutor committed misconduct by making the following remarks in his opening statement:

> "This is not Columbine, this is no Aurora, this isn't Virginia Tech, this isn't a shooting on a military base and yet in light of all the things we've been hearing over the recent past, how different is this really?"

Although the Michigan Court of Appeals agreed that the remarks were improper, it rejected Petitioner's claim:

> Nonetheless, this is not a case where the prosecutor created a great likelihood that the jury would attempt to compare defendant's character to a notorious criminal figure. Rather, the prosecutor asserted that the evidence would establish another inexcusable and horrific shooting. Even defense counsel characterized the shooting in his closing argument as a "horrific event," in part because his defense was based on the theory that defendant was not a participant in the shooting. Thus examined in context, the prosecutor's brief remark, while improper, was not so egregious to be considered outcome determinative. Because defendant's substantial rights were not affected by the prosecutor's improper remark, reversal is not warranted.

Ingram, 2014 WL 1679128, at *7.

Although the prosecutor's remarks were improper, they were not so egregious so as to entitle Petitioner to relief. The remarks were isolated. Defense counsel himself acknowledged that this was a mass-shooting type of event. The jurors in this case would not have been likely to have compared the shooting at the skating rink to the mass shootings mentioned by the prosecutor. Courts have rejected similar misconduct claims involving prosecutorial references to notorious crimes or criminals. See, e.g., Farmer v. Hofbauer, 1 F. App'x 372, 381 (6th Cir. 2001) (single reference comparing petitioner to Hitler did not merit habeas relief); Benton v. Booker, 403 F. App'x 984, 986 (6th Cir. 2010) (prosecutor's statement during rebuttal, stating that defense counsel presented "O.J. Simpson defense" in his closing argument by stating that "if it doesn't fit, you must acquit," did not constitute prosecutorial misconduct); Belei v. Castro, 99 F. App'x 813, 813-814 (9th Cir. 2004) (prosecutor's single reference to the Menendez brothers murder case did not deprive petitioner of a fair trial); Perez v. McEwen, No. EDCV 11-0154-AHM JPR, 2012 WL 1032895, at *16 (C.D. Cal. Jan. 4, 2012), report and recommendation adopted, No. EDCV 11-0154-AHM JPR, 2012 WL 1032892 (C.D. Cal. Mar. 27, 2012) (prosecutor's improper reference to the Virginia Tech massacre did not entitle habeas petitioner to relief). In light of these cases, the Court concludes that fairminded jurists could, at a

minimum, disagree as to whether the Michigan Court of Appeals' decision was incorrect, thus, precluding relief for Petitioner.

Petitioner next contends that the prosecutor denigrated defense counsel using terms like "spaghetti on the wall," "red herring," "snitches get stitches," and "poppycock" in his rebuttal argument.

The Michigan Court of Appeals rejected Petitioner's claim:

> The prosecutor's "spaghetti on the wall" and "poppycock" remarks, examined in context, were responsive to the defense arguments that there was no evidence of defendant's participation in the shooting. The "spaghetti on the wall" remark was responsive to the defense theory that there was no evidence of defendant's participation in the shooting. At the close of rebuttal argument, the prosecutor stated that "the defense theory that you just heard is nothing but poppycock." Examined in context, the prosecutor did not suggest that defense counsel was trying to mislead the jury, but rather was addressing the defense theory that the evidence did not establish defendant's participation in the shooting. We cannot find that use of the term "poppycock" as a characterization of this theory rendered the prosecutor's response unfair. The "red herring" remark appears to be an inartful attempt to point out that that defense counsel did not fully summarize the evidence bearing on Hardiman's credibility and ability to identify defendant. While use of the phrase "red herring" may have been inappropriate, the overall argument was a fair response to defense counsel's closing argument. Viewed in light of the entire record, the challenged remarks were made in the context of an overall argument that fairly responded to defense counsel's arguments regarding the lack of evidence produced by the prosecution at trial. Accordingly, the remarks do not establish plain error warranting relief.

> Defendant also characterizes the prosecutor's remark "snitches get stitches" as an improper attempt to suggest that defense counsel was trying to mislead the jury. However, our review reveals that the remark was part of the prosecutor's response to defense counsel's suggestion that Hardiman provided false information to the police because he was embarrassed that the shooting took place

while he was working security. The prosecutor relied on Hardiman's trial testimony regarding his reluctance to testify and his demeanor to argue that "we can speculate all we want why he did it" and to suggest that the case had "significant effect on his psyche and perhaps his physical safety in the community in which he lives." A prosecutor may not make a factual statement that is not supported by the evidence, but is free to argue the evidence and all reasonable inferences arising from the evidence as it relates to his theory of the case. The prosecutor may also argue on the basis of the evidence whether a witness is credible. A witness's demeanor properly may be considered by a jury in determining the witness's credibility. The issue of Hardiman facing "difficulties" for testifying in this case arose during the course of trial when he was asked if he would testify truthfully despite ". . . the difficulties, perhaps, that could have caused you in the community?" By answering "Right," clearly the issue of Hardiman's safety within the community was brought to light. Thus, examined in context, the "snitches get stitches" remark appears to be responsive to defense counsel's speculation that Hardiman had a motive to cooperate with the police, to the extent that he would provide false information, by suggesting that Hardiman also had reason to not want to cooperate out of concern for his safety. Accordingly, we find no plain error. Further, the trial court instructed the jury that "[t]he lawyers' statements and arguments are not evidence" and "[y]ou should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge." The court's instruction was sufficient to protect defendant's substantial rights.

Ingram, 2014 WL 1679128, at *7-8.

The Sixth Circuit has held that "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." Brown v. McKee, 231 F. App'x 469, 480 (6th Cir. 2007) (quoting United States v. August, 984 F.2d 705, 715 (6th Cir.1992)). Thus, a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel. Id. The Sixth Circuit has rejected

similar remarks as those made by the prosecutor in this case, both on direct appeal from convictions in federal court, and on habeas review of state convictions.  See Key v. Rapelje, 634 F. App'x 141, 149 (6th Cir. 2015) (prosecutor's "smoke screen" or "octopus" argument was prosecutor's characterization of defendant's evidence that did not seriously affected jury's deliberations, and thus was not prejudicial prosecutorial misconduct required to reverse conviction); United States v. Burroughs, 465 F. App'x 530, 535 (6th Cir. 2012) (prosecutor's statement during closing argument, that defendant possessed both firearms and ammunition, and that "the rest of it" was "excuses and red herrings," did not denigrate defense counsel, so as to support finding of prosecutorial misconduct; statement merely highlighted most damning evidence against defendant, evidence that he in fact handled firearms, and argued that all of defense's explanations about why defendant handled them were irrelevant); United States v. Graham, 125 F. App'x 624, 634-35 (6th Cir. 2005) (prosecutor's use of the term "smoke screens" was not an improper attack upon defense counsel, but was simply a remark upon the merits of the defendant's case).

Moreover, the prosecutor's comment that "snitches get stitches" does not appear to have been an attack on defense counsel, but was part of the prosecutor's attempt to explain Hardiman's reluctance to testify.

Moreover, even if the prosecutor's comments about Petitioner's defense were improper, they were not flagrant enough to justify habeas relief.  See Henley v. Cason, 154 F. App'x 445, 447 (6th Cir. 2005).  The prosecutor's comments were not so incendiary so as to inflame the jury's passion or distract them from determining Petitioner's guilt or innocence.  See Davis v. Burt, 100 F. App'x 340, 348 (6th Cir. 2004).  Finally, the prosecutor's remarks were relatively isolated, were not extensive, and were only a small part of a closing argument that focused

heavily on summarizing the evidence presented at trial. <u>Byrd v. Collins,</u> 209 F. 3d 486, 532 (6th Cir. 2000). When combined with the instruction from the trial judge that the attorneys' arguments, questions, and statements were not evidence, the prosecutor's comments did not render the entire trial fundamentally unfair. <u>Id.</u> at 533. The Court rejects Petitioner's prosecutorial-misconduct claim.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland v. Washington,</u> 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. <u>Id.</u> In other words, Petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. <u>Id.</u> at 689. Second, the defendant must show that such performance prejudiced his defense. <u>Id.</u> To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

To show prejudice under <u>Strickland</u> for failing to object to prosecutorial misconduct, a habeas petitioner must show that, but for the alleged error of his trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different. <u>Hinkle v. Randle</u>, 271 F.3d 239, 245 (6th Cir. 2001). Because the Court has already determined that the prosecutor's comments did not deprive Petitioner of a fundamentally fair trial, Petitioner is unable to establish that he was prejudiced by

counsel's failure to object to these remarks.  See Slagle, 457 F. 3d at 528.  Therefore, Petitioner is not entitled to relief on his second claim.

### C.  Claim Three: The Voir Dire/Ineffective-Assistance-of-Counsel Claim

Petitioner next claims that he was deprived of his right to an impartial jury because the prosecutor failed to mention Hardiman's name when identifying potential witnesses during jury selection, thereby preventing Petitioner or his counsel from determining whether any potential jurors knew Hardiman, so that they could challenge the juror.  In the alternative, Petitioner contends that trial counsel was ineffective for failing to object to this omission.

The Michigan Court of Appeals found that Petitioner's voir dire claim was waived because counsel expressed satisfaction with the jury as selected.  Ingram, 2014 WL 1679128, at *9.  The Michigan Court of Appeals further concluded that Petitioner was not entitled to habeas relief on his related ineffective assistance of counsel claim because he failed to show that any jurors who actually knew Hardiman had been impaneled on the jury.  Id.

Although the failure by the prosecutor to name a potential government witness during voir dire can deprive a defendant of from exploring possible juror bias and from excluding the juror by the use of a peremptory challenge, see Lyons v. United States, 683 A.2d 1066, 1069 (D.C. Ct. App. 1996), Petitioner is not entitled to relief on his claim because he failed to show that any of the jurors who were impaneled actually knew Hardiman, see United States v. Aguilar, 503 F.3d 431, 434 (5th Cir. 2007).

Moreover, to maintain a claim that a biased juror prejudiced him, for purposes of maintaining an ineffective assistance of counsel claim, a habeas petitioner must show that the juror was actually biased against him.  See Hughes v. United States, 258 F. 3d 453, 458 (6th Cir. 2001); see also Miller v. Francis, 269 F.3d 609, 616 (6th Cir. 2001).  Petitioner failed to show

that any jurors who actually knew Hardiman sat on his jury. Thus, the Michigan Court of Appeals' rejection of Petitioner's ineffective assistance of counsel claim does not entitle Petitioner to relief.

### D. Claim Four: The Suggestive Identification Claim

Petitioner contends that the trial judge erred in denying his pre-trial motion to suppress Hardiman's identification of Petitioner after Hardiman reviewed photographs of Petitioner taken from the Rolladium's surveillance cameras. Hardiman made this identification four days after the shooting when being shown the surveillance photographs during a police interview.

The Michigan Court of Appeals rejected Petitioner's claim:

> Defendant argues that the Wade hearing established a substantial likelihood that Hardiman misidentified defendant at the photographic lineup because Hardiman was not given a series of photographs to view and was directed to defendant's photograph. In addition, defendant argues, Hardiman admitted to the police that he saw defendant's photograph in the newspaper. Defendant also contends that the police coached Hardiman into asserting that defendant was the shooter, impermissibly corrected Hardiman when he identified a photograph of someone else as a shooter[4], and impermissibly told Hardiman that defendant came from a family with criminal problems. Thus defendant argues, based on the totality of the circumstances, the trial court should have held that the police interview of Hardiman was completely unreliable, that the police engaged in impermissibly suggestive conduct, and that the admission of any identification evidence arising from the police interview would violate defendant's due process rights. Defendant then requests this case be remanded for proceedings to

---

[4] In its opinion, this footnote originally appeared in the sentence as footnote 5, in which the Michigan Court of Appeals wrote, "On this issue, Lieutenant Lalone conceded that he corrected Hardiman after he identified the person in black as the person depicted in exhibit 12. Lalone testified that exhibit 12 was a LEIN photograph of Robert German. Waterford Township Detective Gregory Drumb also testified that, at the end of the interview with Hardiman, Hardiman identified exhibit 12 as that of defendant by stating: 'That's him.'" Ingram, 2014 WL 1679128, at *2 n.5.

determine whether an independent basis exists for any in-court identifications.

We begin our analysis of defendant's arguments on this issue by noting that the evidence presented in this case makes clear that Hardiman was not an eyewitness who viewed every aspect of the defendant's movements before, during, or after the commission of these crimes. Hardiman testified that the event "... was, kind of, confusing ... because as people were shooting, I was actually on the floor, looking up, trying not to get shot, myself, but I did see Mr. Ingram with a gun before the shooting started." Defendant is correct in his assertion that the surveillance photographs shown to Hardiman went beyond everything that Hardiman personally viewed on the night of the shooting. Indeed, Hardiman used photographs of defendant inside the building to identify him as the person he saw outside with the gun. As stated by the trial court, police did not ask Hardiman to view a photograph lineup, but rather asked him to view surveillance photographs from the Rolladium. The use of surveillance photographs to identify a subject generally is not impermissibly suggestive because the surveillance photographs constitute a memory-refreshing device to show the perpetrator of a crime to an eyewitness, as opposed to depicting a possible suspect. Surveillance photographs depicting events that an individual is seeing for the first time can, however, also serve to enhance the memory.

Reviewing defendant's arguments as a whole, they appear to be directed more at Hardiman's credibility rather than the admissibility of his pretrial identification of the man wearing black clothing in the surveillance photographs. We reach this conclusion by considering, as suggested by defendant, the totality of the circumstances, including the close proximity in time and location of the surveillance photographs to when and where Hardiman interacted with the person he described as wearing black clothing, the accuracy of Hardiman's prior description, Hardiman's certainty in making the identification from the surveillance photographs, and the fact that the police interview took place approximately four days after the shooting. We cannot glean from an examination of these circumstances evidence of suggestiveness which would lead us to conclude that there was a substantial likelihood of

misidentification. Rather, our examination of these circumstances leads us to conclude that the trial court did not clearly err in finding that the identification procedure was not impermissibly suggestive. Accordingly, the trial court did not err in denying defendant's motion to suppress Hardiman's pretrial identification of defendant as the person depicted wearing black clothing in the surveillance photographs.

Furthermore, the record reflects that the video recording of Hardiman's police interview was introduced as an exhibit at trial only after defense counsel expressed his intent to play that video recording for the jury. The identification evidence previously introduced by the prosecutor was limited to Hardiman's in-court identification of defendant as one of the people ejected from the building and who later tried to reenter the building with a firearm. "The need to establish an independent basis for an in-court identification arises where the pretrial identification is tainted by improper procedure or is unduly suggestive." Because the pretrial identification procedure was not unduly suggestive, it is not necessary to determine whether an independent basis existed for Hardiman's in-court identification. Therefore, we deny defendant's request to remand for another evidentiary hearing on this issue.

Ingram, 2014 WL 1679128, at *2-3.

Due process protects the accused against the introduction of evidence that results from an unreliable identification obtained through unnecessarily suggestive procedures. Moore v. Illinois, 434 U.S. 220, 227 (1977). To determine whether an identification procedure violates due process, courts look first to whether the procedure was impermissibly suggestive; if so, courts then determine whether, under the totality of circumstances, the suggestiveness has led to a substantial likelihood of an irreparable misidentification. Kado v. Adams, 971 F. Supp. 1143, 1147-1148 (E.D. Mich. 1997) (citing to Neil v. Biggers, 409 U.S. 188 (1972)). Five factors should be considered in determining the reliability of identification evidence: (i) the witness's opportunity to view the criminal at the time of the crime; (ii) the witness's degree of attention at

the time of the crime; (iii) the accuracy of the witness's prior description of the defendant; (iv) the witness's level of certainty when identifying the suspect at the confrontation; and (v) the length of time that has elapsed between the time and the confrontation. Neil, 409 U.S. at 199-200.

If a defendant fails to show that the identification procedures are impermissibly suggestive, or if the totality of the circumstances indicates that the identification is otherwise reliable, no due process violation has occurred; so long as there is not a substantial misidentification, it is for the jury or fact finder to determine the ultimate weight to be given to the identification. See United States v. Hill, 967 F. 2d 226, 230 (6th Cir. 1992).

In the present case, Petitioner has failed to show that the identification procedure was unduly suggestive. Hardiman was shown photographs from the Rolladium's surveillance camera depicting the events and the persons surrounding the shooting at the skating rink on the night that Hardiman was working security. "[L]ittle possibility of misidentification arises from the use of photographs depicting 'the likeness not of some possible suspect in the police files, but of the [persons] who actually committed the [crime].'" United States v. Monks, 774 F.2d 945, 957 (9th Cir. 1985) (quoting United States v. Evans, 484 F. 2d 1178, 1186 (2nd Cir. 1973)). To refresh a witness' memory from a source that depicts the actual perpetrator of the crime runs "a significantly smaller risk of misidentification than to refresh it from a source unrelated to the actual events." Evans, 484 F. 2d at 1186. In this case, it was not impermissibly suggestive for Hardiman to view the surveillance photographs that depicted Petitioner inside of the skating rink at the time of the shooting. See United States v. Bridgefourth, 538 F.2d 1251, 1253 (6th Cir. 1976); see also United States v. Peterson, 411 F. App'x 857, 865 (6th Cir. 2011) (police officer's inquiry whether eyewitness could identify bank robber from photo array was not unduly

suggestive, in violation of defendant's due process rights, even if witness viewed photographs of robber in newspaper before identification; photograph of robber in newspaper was taken from bank's security camera during commission of robbery and would have been no different than what witness saw at bank).

Petitioner failed to show that Hardiman's in-court identification was the product of a suggestive pre-trial identification. This Court notes that "the Supreme Court has never held that an in-court identification requires an independent basis for admission in the absence of an antecedent improper pre-trial identification." Cameron, 348 F. Supp. 2d at 843. Moreover, "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." Perry v. New Hampshire, 132 S. Ct. 716, 730 (2012). Hardiman was not subjected to a suggestive pre-trial identification; accordingly, his in-court identification of Petitioner does not entitle Petitioner to habeas relief.

### E. Certificate of Appealability and Leave to Proceed In Forma Pauperis on Appeal

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327. In applying that standard, a

district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. Id. at 336-337. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; Castro v. United States, 310 F.3d 900, 901 (6th Cir. 2002).

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right with respect to any of his claims. Accordingly, a certificate of appealability is not warranted in this case.

Although the Court denies a certificate of appealability to Petitioner, the standard for granting an application for leave to proceed in forma pauperis is a lower standard than the standard for certificates of appealability. Foster v. Ludwick, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002) (citing United States v. Youngblood, 116 F.3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant in forma pauperis status if it finds that an appeal is being taken in good faith. Id. at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. Foster, 208 F. Supp. 2d at 765. Although jurists of reason would not debate the Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed in forma pauperis on appeal. Id. at 764-765.

## IV. CONCLUSION

For the reasons stated above, the Court denies the petition for a writ of habeas corpus, declines to issue a certificate of appealability, but grants Petitioner leave to proceed in forma pauperis on appeal.

SO ORDERED.


Dated:  May 16, 2017                                    s/Mark A. Goldsmith
        Detroit, Michigan                              MARK A. GOLDSMITH
                                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 16, 2017.

                                                       s/Karri Sandusky
                                                       Case Manager